**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jeffrey P. SKIDMORE, Defendant–Appellant.**

**No. 89–1625.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 7, 1989.

Decided Feb. 2, 1990.

Thomas M. Durkin, Asst. U.S. Atty., Ronald S. Safer (argued), Chicago, Ill., for plaintiff-appellee.

Thomas K. McQueen (argued), Jenner & Block, Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, and CUMMINGS and CUDAHY, Circuit Judges.

BAUER, Chief Judge.

On February 3, 1988, the grand jury returned a two-count indictment against Jeffrey Skidmore. The first count charged him with possession of two kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and the second count charged him with travelling in interstate commerce while engaged in an unlawful narcotic activity, in violation of 18 U.S.C. § 1952. After a jury trial, Skidmore was convicted of both counts. This is his appeal.

His first claim is that the law enforcement officials who detained his bag did not have a reasonable, articulable suspicion that the bag contained contraband. His second claim is that there was insufficient evidence to establish his knowing possession of narcotics. We affirm Skidmore's conviction.

## I.

On January 5, 1988, Agent Zandy, Officer Glynn, and Detective Kinsella, members of the Drug Enforcement Administration's ("DEA") O'Hare Airport Task Force, awaited the arrival of Amtrak Train No. 4 at Union Station, Chicago. Train No. 4's city of origin, Los Angeles, is a source city for drugs, i.e., a city where narcotics are known to be smuggled into the United States and then distributed to other domestic cities. Skidmore was one of the first passengers off the train. Although it was the dead of winter, Skidmore wore only a sweat shirt and jogging pants. He carried two small bags, one clutched tightly at his side. Skidmore first walked past Detective Kinsella, and then past Officer Glynn and Agent Zandy. He glanced back over his shoulder at the agents several times as he exited the terminal area. As Skidmore neared the exit doors of the station, Glynn and Zandy approached him.

Glynn identified himself as a police officer and asked if Skidmore would speak with him. Glynn then asked Skidmore if he had any identification. Skidmore replied that he did not. Glynn asked for his train ticket. The ticket identified him as J. Skidmore and revealed that a one-way fare of $253 for travel from Los Angeles to Chicago had been paid for in cash the day before the train left. Skidmore asked why he was being questioned. Glynn replied that he was a narcotics investigator and narcotics investigations were being conducted at Union Station. He also informed Skidmore that Skidmore was not under arrest and was free to leave anytime, but that he would like to ask a few more questions. When Glynn asked for Skidmore's name and address, Skidmore became visibly nervous. He gave two different addresses and had trouble remembering his telephone number. Skidmore asked Glynn why he was being "hassled," to which Glynn replied that he was not under arrest and could leave anytime. Glynn then asked why he was in Chicago. Skidmore stated that he was visiting his parents who lived in Muskegon, Michigan, and were to pick him up after he called from Chicago.

Glynn next asked Skidmore if he was carrying any illegal drugs, or if he was carrying any packages for anyone else, the contents of which may be unknown to him. Skidmore answered no to both questions. When asked whether he owned the bags he carried from the train, Skidmore looked at

the bags for approximately fifteen seconds and stated, "Yes, they are my bags."

After explaining again that he was not under arrest and had the right to refuse the following request, Glynn asked permission to search Skidmore's bags, which Skidmore gave. Glynn bent down to search the bag that Skidmore had held close to him, but before Glynn opened the bag, Skidmore withdrew his consent. Glynn did not search the bag, and Agent Zandy asked Skidmore why he withdrew his consent for the search. Skidmore responded that now he was not sure that the bag was his, because he thought his bag was newer. Glynn then told him that his bags were going to be detained briefly for inspection by a trained narcotics detection dog. Skidmore was invited to view the procedure but declined.

The detection dog reacted to the bag that Glynn was about to search, indicating that the bag contained narcotics. Kinsella informed Skidmore about the dog's reaction to the one bag, and returned the other bag to him. Skidmore pointed to the bag that was not returned to him and stated that the bag definitely was not his. Kinsella then gave Skidmore a receipt for the bag, which he kept. Skidmore stated he was going to the baggage claim area to find his bag. The agents followed a minute later but Skidmore had disappeared.

The next day, Zandy and Glynn obtained a search warrant for the bag. In it they found two packages containing over two kilograms of cocaine.

Skidmore subsequently was indicted. At trial, he filed a motion to suppress the physical evidence, which the district court denied. The first trial ended in a mistrial because of a deadlocked jury. After a second jury trial, Skidmore was found guilty as charged in the indictment. The district court sentenced Skidmore to five years in the custody of the Attorney General, to be followed by four years supervised release. Skidmore then filed a timely notice of appeal.

## II.

Skidmore first challenges the legality of the detention of his bags. A brief, warrantless detention of property for further investigative purposes does not violate the fourth amendment if the detention is based upon reasonable suspicion. *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). Skidmore argues, however, the district court's determination that the agents had reasonable suspicion was clearly erroneous. Therefore, he continues, the search was unlawful and the fruits of the search, the two kilograms of cocaine, should have been suppressed under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We disagree.

This first challenge has two parts. Initially, Skidmore claims that his bag was searched in response to his decision to withdraw consent to the search. Skidmore is correct in arguing, and the government does not contest, that a law enforcement official cannot consider Skidmore's refusal to consent as a factor in the official's determination of reasonable suspicion. The district court found, however, that Skidmore's bags were detained in response to his statement that he did not know if the bags were his, not in response to his statement withdrawing consent. This finding is not clearly erroneous.

The court found that the following sequence of events occurred: Skidmore withdrew his consent; when asked why, he stated that he was longer sure that the bags were his; after this exchange, Glynn decided he was going to search the bags. The record supports the court's finding. Both Glynn and Zandy testified to this sequence of events. Skidmore contends that the cross-examination of Glynn contradicts this testimony. On cross-examination, however, defense counsel entirely omitted Skidmore's statement about ownership of the bag in attempting to establish the sequence of events. This excerpt of testimony, therefore, sheds no light on whether the detention came before or after Skidmore's statement that he did not own the bags. Skidmore also points to the cross-examination of Zandy, but that cross-examination is similarly ambiguous.

928

The district court further found that the statement concerning ownership was a significant factor in Glynn's decision to detain the bags and that Skidmore's withdrawal of consent was a relatively insignificant factor. This type of determination, made by the court after the opportunity to observe witnesses and assess credibility, is entitled to deference. *United States v. Espinosa–Alvarez*, 839 F.2d 1201, 1205 (7th Cir.1987). Skidmore does not challenge this determination in any meaningful way.

 Second, Skidmore contends that the totality of circumstances encountered by the agents did not amount to reasonable suspicion. *See United States v. Sokolow*, — U.S. —, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). The district court took into account the following facts in determining whether the agents had reasonable suspicion to detain: Skidmore arrived from a source city; he had no identification; he purchased his ticket the day prior to departure in cash; and he became nervous while speaking with the agents. The most significant factor, of course, was Skidmore's repudiation of ownership. Minutes earlier, after examining of the bags and prior to any indication by the agents that they might want to search his bags, Skidmore had acknowledged ownership. The district court found that these circumstances amounted to reasonable suspicion and we agree.

Skidmore's other claim on appeal is that the government failed to prove beyond a reasonable doubt his knowing possession of narcotics. In analyzing a challenge to the sufficiency of the government's evidence, we ask whether *"any* rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). Furthermore, we view the evidence in the light most favorable to the government in making this determination. *United States v. Draiman*, 784 F.2d 248, 251 (7th Cir.1986). That said, we find that Skidmore's second claim on appeal has no merit.

In addition to the circumstances which the district court found created reasonable suspicion, such as Skidmore's visible nervousness at being questioned and his lack of identification, the jury was presented with substantial other evidence establishing Skidmore's knowing possession. First among this evidence is Skidmore's considered statement that he owned the bag later found to contain cocaine. People are presumed to know the contents of their belongings. More importantly, Skidmore also stated that he was not carrying packages for anyone else, the contents of which he may have been unaware. Skidmore's belated denial of ownership reinforces the inference that he knew about the presence of cocaine. As it became apparent that Glynn would search the bag and find the cocaine, Skidmore repudiated ownership. These facts are sufficient to establish Skidmore's knowing possession of cocaine beyond a reasonable doubt.

### III.

Jeffrey Skidmore's conviction is therefore

AFFIRMED.