**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**William J. ASHFORD,**
**Defendant–Appellant.**

**No. 90–1425.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 6, 1990.

Decided Feb. 15, 1991.

David E. Bindi, Asst. Atty. Gen., Barry R. Elden, Asst. U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Kenneth L. Cunniff, Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, FLAUM, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

FLAUM, Circuit Judge.

Defendant William Ashford was convicted of conspiring to possess, possessing, and selling treasury checks stolen from the mail. Ashford appeals these convictions, alleging that he was deprived of his constitutional right to a speedy trial, that the government failed to disclose key information concerning alleged informants, that the government failed to prove beyond a reasonable doubt an element of the crime of possessing items stolen from the mail, and that the prosecution during closing argument impermissibly adverted to Ashford's exercise of his constitutional right not to present a defense. We find Ashford's challenges to be without merit and affirm the convictions.

## I. FACTS AND PRIOR PROCEEDINGS

Each Spring, millions of Americans who have overpaid their federal income taxes eagerly await refund checks from the government. In the Spring of 1984, some of these checks never arrived. In early April of that year, James Austin telephoned a person he had been told was interested in purchasing a $1,400 treasury check Austin had obtained. Unfortunately for Austin, the person he spoke with was Special Agent Loren Procter, a member of the treasury check forgery squad, a group of undercover Secret Service agents based in Chicago. The two men arranged a meeting, and while discussing how much Procter would pay for the stolen check, Austin told Procter that he had a friend who worked for the post office and could supply over $100,000 in treasury checks on a regular basis.

Austin and Procter met again on May 7, 1984, at which time Austin gave Procter some Illinois tax refund checks. A second meeting arranged for later that day fell through, but Austin called Procter the next morning to tell him that another of his sources at the post office was in possession of $18,000 in treasury checks he was eager

to sell. Again a meeting was arranged and again the meeting fell through, this time, Austin told Procter, because his source was stuck in traffic on the way from Chicago's western suburbs. Procter, professing to be annoyed by the delays, told Austin not to call again until he had the checks in hand.

On the morning of May 10, Austin contacted Procter and arranged another rendezvous to take place that afternoon at Orly's, a restaurant located at the corner of Dearborn and Harrison in Chicago's South Loop. During the meeting, Procter asked Austin the identity of Austin's source for the stolen treasury checks, and Austin responded by pointing to a pair of men seated in a car parked outside the restaurant. A few minutes later, Austin handed Procter a sheaf of treasury checks and Procter handed Austin $7,000 in cash. Austin was arrested moments later, along with the two men in the car, Willie Russell and the defendant in this case, William Ashford.

The forty-two tax refund checks Procter purchased in the restaurant that day were numbered sequentially, dated May 4, 1984, and addressed to taxpayers living in a single ZIP code on Chicago's South Side. The checks were wrapped in a piece of notebook paper with writing on it reflecting a tally of the face amount of the checks, adding up to $18,872. Found on Austin's person was a slip of paper bearing the names "Willie," "Jimmie," and "Skeet," the last being Ashford's nickname, as well as three telephone numbers corresponding to these individuals. Also written on the paper were the figures "$19,000" and "⅓." At the time he was arrested, Ashford was employed as a mail handler at a postal facility in River Grove, Illinois, a western suburb of Chicago. His fingerprints were found on the tally sheet in Austin's possession and his palm print was found on one of the checks Austin sold to Procter.

Though Ashford was charged in a criminal complaint filed the day after his arrest, May 11, 1984, that complaint was dismissed on the government's motion a month later. It took four more years for Ashford's case to make its way from his arrest at Orly's

Restaurant three blocks north on Dearborn Street to the federal building, where Ashford and Austin were indicted on June 16, 1988. The indictment was in four counts, the first relating only to Austin's sale of state tax refund checks to Agent Procter, the remainder to the possession and sale of federal refund checks by Ashford and Austin. Count 2 charged Austin and Ashford with conspiring to unlawfully possess stolen mail in violation of 18 U.S.C. § 1708 and stolen treasury checks in violation of 18 U.S.C. § 510(b). Count 3 charged Austin and Ashford with possession of stolen mail in violation of 18 U.S.C. § 1708. Count 4 related to the distribution of the stolen checks to Procter, a violation of 18 U.S.C. § 510(b). Ashford was tried alone, chose not to present a defense, and after a four-day jury trial in December 1989, was convicted on all three counts. He was later sentenced to a six month term in a work-release program and five years of probation.

## II. PRE– AND POSTINDICTMENT DELAY

As might be expected, the first ground Ashford raises on appeal concerns the five and one-half years that elapsed between arrest and trial in this case. Ashford asserts that this delay prejudiced him because government records of the investigation of Austin that he sought to use at trial to support an entrapment defense were lost or destroyed with the passage of time. He also asserts that the delay impaired the recollection of government witnesses regarding the investigation that led to his arrest and the role persons whom Ashford sought to prove were informants had played in that investigation. The government counters that Ashford was provided with adequate evidence concerning the role (or lack thereof) that the various people he suspects were informants played in the investigation, and that none of the information Ashford sought would have supported an entrapment defense had Ashford chosen to present one. The district court concluded that the delay in bringing Ashford to trial did not amount to a constitutional violation and denied Ashford's pretrial motion to dismiss. We believe this ruling was correct.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial...." U.S. Const. Amend. VI. However, not all delay between arrest and trial implicates the Sixth Amendment. As the Supreme Court explained in *United States v. MacDonald*, "no Sixth Amendment right to a speedy trial arises until charges are pending." 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982); *see also United States v. Marion*, 404 U.S. 307, 313 (1971) ("On its face, the protection of the Amendment is activated only when a criminal prosecution has begun...."). In this case, while Ashford's speedy trial right originally attached upon his arrest on May 10, 1984, *see Dillingham v. United States*, 423 U.S. 64, 65, 96 S.Ct. 303, 303–04, 46 L.Ed.2d 205 (1975) (*per curiam*), it lapsed during the four-year period beginning on June 8, 1984, when the government dismissed its complaint against Ashford, and ending June 18, 1988, when the grand jury returned its indictment. *See MacDonald*, 456 U.S. at 7, 102 S.Ct. at 1501 (1982) ("[T]he Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges."); *United States v. Dyal*, 868 F.2d 424, 429 (11th Cir.1989); *United States v. Zukowski*, 851 F.2d 174, 178 (7th Cir.), *cert. denied*, 488 U.S. 868, 109 S.Ct. 174, 102 L.Ed.2d 144 (1988).

While "[t]he statute of limitations is the primary safeguard of a right to a timely indictment," *United States v. Carmany*, 901 F.2d 76, 78 (7th Cir.1990), a defendant who complains that the government waited too long to bring his or her indictment is not bereft of constitutional protection. Rather, as the Supreme Court held in *United States v. Lovasco*, "the Due Process Clause has a limited role to play in protecting against oppressive delay." 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977). To successfully advance a claim that pre-indictment delay violated due process, a defendant must " 'prove that the delay caused actual and substantial preju-

dice to his or her fair trial rights and that the government delayed indictment for tactical advantage or some other impermissible reason.'" *United States v. Chappell*, 854 F.2d 190, 195 (7th Cir.1988) (quoting *United States v. Watkins*, 709 F.2d 475, 479 (7th Cir.1983)).

■ According to Ashford, the four-year delay in bringing his indictment prejudiced him by preventing him from establishing that Willie Russell, the third person arrested with Ashford and Austin after the sale of the treasury checks to Agent Procter, and Bennie Langston, one of Ashford's coworkers at the River Grove postal facility, were government informants who entrapped Ashford. He also contends that other evidence such as a log book listing calls made to and from the phone number the Secret Service treasury check squad used in its undercover operations and tapes of certain phone calls between Austin and Agent Procter was lost or destroyed during the long interval between the investigation that led to Ashford's arrest and his indictment. More generally, Ashford argues that the long delay took a psychological toll on him and interfered with his ability to obtain employment.

While we agree with Ashford that justice would have been better served had this relatively straightforward prosecution been brought sooner, we are unable to conclude that the delay in bringing charges caused him "actual and substantial prejudice." First, it is not clear how discovering that either Russell or Langston were government informants would have helped Ashford to assert an entrapment defense. The evidence shows that Ashford met Russell for the first time after Ashford had already stolen the treasury checks from the postal facility where he worked and was on his way to give them to Austin so that Austin could sell them to Agent Procter. This suggests that Russell's testimony would hardly have aided Ashford in showing an absence of predisposition to commit the three offenses for which he was tried, an essential element of an entrapment defense. *See United States v. Rivera–Espi-*

*noza*, 905 F.2d 156, 158 (7th Cir.1990) (collecting cases).

As to Langston, the government fully investigated Ashford's assertion that Langston was a government informant and certified to the district court that it had come up with no evidence that he was. Unlike Russell, Langston was available to testify at trial, but Ashford never called him. Most damaging to Ashford, he never asserted that Langston encouraged him or coerced him to steal items from the mail, only that he had revealed to Langston his view that there was corruption among postal officials and that Langston had passed on this view to his superiors, leading them to target Ashford for arrest. Any contribution that evidence that Langston was an informer could have made to Ashford's entrapment defense is at best "speculative, and as such, will not suffice to establish actual prejudice." *United States v. Floyd*, 882 F.2d 235, 242 (7th Cir.1989).

The same is true concerning the missing phone logs and tapes. Ashford asserts that the phone logs and tapes would have established that Austin, too, was a government informant who had entrapped Ashford. However, the tapes of phone conversations between Austin and Agent Procter that the government did turn over failed even to suggest that Austin worked for the government. Further weakening Ashford's assertion that Austin entrapped him is the fact that Austin was indicted for— and convicted of—the same offenses for which Ashford was tried, and for which he received a stiffer sentence than did Ashford. Moreover, as with Langston, Austin presumably was available to be called as a witness in Ashford's trial, but, as with Langston, Ashford never sought to obtain his testimony. As to the logs and tapes, the mere fact that preindictment delay causes evidence to be unavailable does not establish actual prejudice. *See United States v. Valona*, 834 F.2d 1334, 1338 (7th Cir.1987) ("It is clear that the death of a witness alone is insufficient to establish actual prejudice."); *cf. Arizona v. Youngblood*, 488 U.S. 51, 57–58, 109 S.Ct. 333, 337–38, 102 L.Ed.2d 281 (1988) (mere failure of police to preserve potentially excul-

patory evidence insufficient to violate defendant's due process rights).

Turning to the second leg of the preindictment delay analysis, Ashford has conceded throughout this litigation that "[t]here was no evidence of any bad faith by the Government in this delay." Defendant's Brief at 17. Since Ashford has failed to establish either that the four-year delay in bringing his indictment prejudiced him in any real and substantial way, or that the delay was motivated by an impermissible motive such as the pursuit of tactical advantage, we conclude that the preindictment delay in this case did not violate his right to due process of law.

■ Ashford also asserts that the eighteen-month delay between his indictment in June 1988 and the start of his trial in December 1989 violated his Sixth Amendment right to a speedy trial. In analyzing a Sixth Amendment speedy trial claim, we apply the four-factor test set out in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), looking to the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530, 92 S.Ct. at 2191–92; *see, e.g., United States v. Kimberlin*, 805 F.2d 210, 225 (7th Cir. 1986), *cert. denied*, 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987); *United States v. Brock*, 782 F.2d 1442, 1445 (7th Cir. 1986); *United States ex rel. Mitchell v. Fairman*, 750 F.2d 806, 807–08 (7th Cir. 1984).

We have in the past held that delays of as little as twelve months are presumptively prejudicial, *see, e.g., United States v. Jackson*, 542 F.2d 403, 407 (7th Cir.1976), so the delay of eighteen months in this case creates the "necessity for inquiry into the other factors that go into the balance." *Id.* The delay in bringing this case to trial, however, was largely caused by the substitution of defense counsel after defendant's first attorney was relieved of his appointment by the district court as well as Ashford's decision to file numerous discovery requests. Both of these reasons "serve[d]

to justify appropriate delay," *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192, because they protected the defendant's constitutional rights to effective assistance of counsel and due process of law as well as rights to pretrial discovery created by statute and rules of criminal procedure.[1] Indeed, as noted above, Ashford concedes that the delay in this case was not caused by an illegitimate motive of the kind that "should be weighted heavily against the government." *Id.*

Turning to the third *Barker* factor, the defendant in this case asserted his speedy trial right through a pretrial motion submitted to the district court in early October 1989, two months before trial began. While it seems clear that defendant waited to assert the right until late in the period of delay, especially since the period of delay he complained of in his motion included not only the postindictment period but the four-year preindictment period as well, it is reasonable to assume that some of his delay in asserting his speedy trial right was caused by the disruption in defendant's representation caused by the district court's decision to relieve Ashford's first counsel of his appointment. We conclude that this factor neither weighs for Ashford or against him. We come to the last *Barker* factor, prejudice. We have already concluded that Ashford suffered no real and substantial prejudice from the four-year delay between the dismissal of the complaint against him and the subsequent indictment. The same is true of the delay following the indictment. Balancing the *Barker* factors leads to the conclusion that Ashford's Sixth Amendment right to a speedy trial was not violated by the eighteen-month delay following his indictment, the great majority of which was caused by the appointment of substitute counsel and defense pretrial motions and none of which substantially prejudiced his defense.

## III. USE OF A SUMMARY WITNESS

■ Ashford's next ground on appeal concerns the government's presentation of

---

**1.** The time not accounted for by motions and other reasons that fall within the various categories of excludable delay under the Speedy Trial Act, *see* 18 U.S.C. § 3161(h)(1)(F), amounted to only 53 days.

testimony concerning the contents of Secret Service files. At trial the government called as a witness Secret Service Agent Patricia Walker, who testified as to her review of confidential files involving informants. The government put Agent Walker on the stand to counter testimony elicited during earlier defense cross-examination of Agent Procter and a postal inspector involved in the Secret Service investigation. Both men testified that they could not be sure that Willie Russell was not serving as a government informant on the date Ashford was arrested, though neither recalled that Russell ever acted in that capacity. Agent Walker blunted the doubt created by this testimony as to Russell's ties to the government by testifying that her review of relevant files maintained in the Secret Service's Chicago office disclosed that no one by the name of Willie Russell was used as an informant by the Secret Service in 1984.

Defense counsel objected to this line of questioning on the ground that Agent Walker's testimony concerning the files she had reviewed would be hearsay. The district court overruled this objection, deciding that the files came within an exception to the hearsay rules, but raising, *sua sponte*, the issue of whether Agent Walker's testimony would be a summary of voluminous records under Federal Rule of Evidence 1006. That rule "removes the Best Evidence Doctrine as an impediment to proving the content of voluminous written, recorded, or photographic material by means of a 'chart, summary, or calculation' when the underlying material 'cannot conveniently be examined in court.'" 5 D. Louisell & C. Mueller, Federal Evidence § 598 at 536 (1981) (quoting Fed.R.Evid. 1006). However, the rule requires the par-

ty seeking to summarize the contents of voluminous records to make those records available for examination by other parties. Concluding that Agent Walker would be testifying as a summary witness, the district court ordered the government to make the records that she reviewed available to the defense. Sensing the government's reluctance to make the records available, the district court warned the prosecutor that "if it gets to the point where we are at the cross-examination stage, and the documents have not been [made] available, I'm going to grant a recess." Transcript at 366. When defense counsel renewed his objection during the course of the government's examination, the district court reassured him that "the records, if they have not yet been made available, will be made available to you." Transcript at 368–69.

■ Agent Walker testified late on a Friday afternoon. She was the penultimate witness in the government's case, which because Ashford chose not to present a defense, was the only testimony the jurors heard. On Monday morning, the government announced that it had changed its mind and did "not intend to make available the confidential informant files." Transcript at 392. Counsel and the district court discussed the question of whether Rule 1006 applied to the files. The upshot of this discussion was the district court's decision to order the jury to disregard Agent Walker's testimony.[2] Defense counsel, asserting that this curative instruction would be insufficient to undo the prejudice to Ashford caused by Walker's testimony, moved for a mistrial, which the district court denied.

---

**2.** We are concerned with the government's apparent change of heart with regard to turning over the files that Agent Walker summarized in her testimony. The record suggests that the government agreed in a sidebar conference on Friday that it could question Agent Walker with respect to the files only if it turned them over, as Rule 1006 requires. Certainly this was the district court's understanding. *See* Transcript at 368–69. The sensitive nature of the information contained in the files may have made disclosure inappropriate, and perhaps in camera review

would have struck the proper balance between "the government's substantial interest in maintaining the secrecy of its files" and "the defendant's ... discovery rights." *United States v. Phillips,* 854 F.2d 273, 277 (7th Cir.1988). However, once the district court judge allowed the examination of Agent Walker to proceed subject to the condition that the files would be disclosed, the government, by eliciting further testimony from Agent Walker, became bound by this condition.

Ashford appeals the denial of his motion for a mistrial. He argues that the district court's instruction was ineffective to repair the damage Agent Walker's testimony had caused him, particularly since the jury had all weekend to reflect on what Walker had said. The government responds that Ashford never established what benefit evidence that Willie Russell was an informant would have for his defense, making it unlikely that Agent Walker's testimony meaningfully influenced the jury's decision to convict.

Our review of a district court's exercise of its "broad discretion with regard to declaring mistrials ... is limited to whether the denial of a motion for mistrial constituted an abuse of [its] discretion." *United States v. Beverly*, 913 F.2d 337, 351 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 766, 112 L.Ed.2d 786 (1991); *see United States v. Perez*, 870 F.2d 1222, 1227 (7th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 136, 107 L.Ed.2d 95 (1989). In this case, rather than granting a mistrial, the district court chose to honor the "almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *see United States v. Sophie*, 900 F.2d 1064, 1077 (7th Cir.1990). We cannot say that this was an abuse of discretion.

The effect of Agent Walker's testimony was to exclude the possibility that Willie Russell was a government informant. As we observed in relation to our discussion of Ashford's speedy trial claim, whether or not Russell had ties to the government matters little to any entrapment defense Ashford might have asserted. In his closing argument, however, Ashford's counsel attempted to cast Russell not as the informant that entrapped Ashford but as the real source of the treasury checks that Austin sold to Agent Procter. This theory founders on several grounds independent of whether Russell was or was not an informant: the first is the piece of paper found in Austin's possession, which appears to reflect an agreement between Austin, Russell, and Ashford, giving each man one-third of the proceeds from the sale

of the checks. A reasonable jury could well have concluded that Ashford would not have received so generous a share if he was just along for the ride. The second is the presence of Ashford's palm print on one of the treasury checks, which supports the government's assertion that Ashford was the source. Third is the fact that, whether or not Russell was an informant, he was not a postal worker; Ashford was, and the evidence established that he had regular access to treasury checks. Finally, one person whose testimony might have shed light on the question of who supplied the checks was Austin, who sold them to Agent Procter. Ashford, however, never sought to call Austin to bolster his case that Russell rather than Ashford had stolen the checks.

We recognize that Russell's role in the sale of the checks remains largely unexplained. The government elected not to file charges against Russell in 1984 because of the insufficiency of the evidence against him and Russell had disappeared by the time the 1988 indictment was filed. This set of facts encouraged the defense to seek to create reasonable doubt as to Ashford's culpability by hinting at Russell's. Because the success or failure of these efforts did not hinge on whether Russell worked for the government, the ultimate point of Agent Walker's testimony, the district court was within its discretion in seeking to undo whatever damage that testimony caused defendant through a curative instruction rather than by granting a mistrial.

## IV. SUFFICIENCY OF THE EVIDENCE AS TO COUNT 3

Count 3 of the indictment charged Ashford with possessing items stolen from the mail knowing that they were stolen, in violation of 18 U.S.C. § 1708. On appeal, Ashford challenges his conviction on this count on the ground that there was insufficient evidence to prove that the treasury checks he gave Austin to sell to Procter were stolen from the mail, an essential element of a violation under § 1708. *See, e.g., United States v. Norwood*, 798 F.2d

1094, 1096 (7th Cir.), *cert. denied,* 479 U.S. 1011 (1986); *United States v. Turquitt,* 557 F.2d 464, 470 n. 10 (5th Cir.1977). Ashford points to the testimony of a Treasury Department official, Robert Simon, who was examined concerning Department procedures with respect to the tax refund checks Austin sold to Procter. Simon testified that these checks came from a batch of 429,077 checks printed at a facility in Kansas City, Kansas. On cross-examination, Simon admitted that not all the checks printed in Kansas City that day were mailed. Approximately 33,262, or 7.8 percent of the checks printed, were not mailed, and were instead "pulled" from the batch. Simon conceded that he could not be sure whether the checks Austin sold to Procter were among those mailed on May 4. At the close of the government's case, Ashford moved for a directed verdict on the ground that no reasonable juror could convict him for possession of items stolen from the mail when there was only a 92.2 percent chance that the items he is charged with stealing were ever mailed. The district court denied the motion, and Ashford appeals this decision.

In evaluating a challenge to the sufficiency of the government's evidence,

> we ask whether '*any* rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt.' *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). Furthermore we view the evidence in the light most favorable to the government in making this determination.

*United States v. Elizondo,* 920 F.2d 1308, 1315 (7th Cir.1990) (quoting *United States v. Skidmore,* 894 F.2d 925, 928 (7th Cir. 1990)). In conducting this inquiry, we " 'defer to reasonable inferences drawn by the jury and the weight it gave to the evidence.' " *United States v. Caudill,* 915 F.2d 294, 297 (7th Cir.1990) (quoting *Bever-*

*ly,* 913 F.2d at 360 (7th Cir.1990). Applying this standard, we conclude that the evidence in this case was sufficient for jurors to draw a reasonable inference that the checks Ashford provided to Procter had been mailed. The evidence that the checks were stolen from the mail was that Agent Procter testified that Austin claimed that he received treasury checks from a source at the post office, as well as the not inconsequential fact that Ashford was a mail sorter with regular access to treasury checks committed by the Treasury to the care of the postal service. This is strong evidence that the checks sold to Agent Procter were indeed among the nearly 400,000 mailed from Kansas City.[3]

Moreover, alternative explanations for Ashford's possession of the checks in Chicago six days after they were produced in Kansas City are implausible. *See United States v. Graves,* 736 F.2d 850, 853 (2d Cir.1984) (jury permitted to infer theft from the mail where circumstances strongly support inference, despite "theoretical[ ] possib[ility]" that checks were stolen from intended recipients); *United States v. Rhodes,* 713 F.2d 463, 474–75 (9th Cir.), *cert. denied,* 464 U.S. 1012, 104 S.Ct. 535, 78 L.Ed.2d 715 (1983) (in challenge to sufficiency of the evidence that items found in defendant's possession were stolen from the mail, it is probative that any other theory would require "extraordinary coincidence" of events). It is conceivable that the checks Ashford was charged with stealing were pulled by the Treasury and then stolen from the Kansas City facility and transported to Chicago, or that Ashford or Austin combed a South Side neighborhood stealing refund checks from their recipients, but neither set of events is even remotely as likely as the simple story the government propounded and the jury apparently believed: that Ashford stole them from the postal facility where he worked.

---

**3.** In concluding that the evidence was sufficient, we look to the strength of the inferences that could be drawn from the facts of this case, particularly Ashford's employment as a postal worker, rather than focusing on the percentage of checks printed at the Kansas City facility that

reached the postal service on May 4. We do not seek to resolve the much-pondered question of what numerical degree of probability that a defendant committed a particular element of an offense will satisfy the government's burden to prove that element beyond a reasonable doubt.

## V. IMPROPER PROSECUTORIAL COMMENTS ON DEFENDANT'S FAILURE TO PRESENT A DEFENSE

■ The last ground Ashford raises on appeal concerns a series of comments made by one of the prosecutors in this case during his closing argument which, Ashford alleges, made reference to his failure to testify or to present a defense in violation of his Fifth Amendment right to remain silent. *See Griffin v. California,* 380 U.S. 609, 613–14, 85 S.Ct. 1229, 1232–33, 14 L.Ed.2d 106 (1965); *Williams v. Lane,* 826 F.2d 654, 664–65 (7th Cir.1987). Ashford points to three comments by the prosecutor in which he told the jury to "smile" at defense counsel as a signal that counsel should address possibly the most damaging evidence in the case, the piece of paper found on Austin containing Ashford's name and the presence of Ashford's palm print on the checks sold to Agent Procter. Transcript at 437, 440.[4]

Because the prosecutor's comments in this case did not directly comment on Ashford's failure to take the stand or present a defense, but rather were addressed to the presence of uncontradicted evidence (Ashford's palm print on the checks and the slip of paper with his name on it), they violated Ashford's Fifth Amendment rights only to the extent that the " 'language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify.' " *Perez,* 870 F.2d at 1229 (quoting *United States ex rel. Burke v. Greer,* 756 F.2d 1295, 1300 (7th Cir.1985). The comments drew attention to the defense's failure to rebut damaging inferences that could be drawn from the palm print and the appearance of the defendant's name on the slip of paper found on Austin. The slip of paper and particularly the fingerprints were the kind of evidence that jurors would naturally have looked to Ashford to contradict, making the comments by the prosecutor particularly unfortunate. *See United States v. DiCaro,* 852 F.2d 259, 263 (7th Cir.1988); *Williams,* 826 F.2d at 665. The district court's understandable displeasure with this manner of argument led him to sustain the repeated defense objections.

■ "Comments about a defendant's failure to testify do not necessarily mandate reversal," however. "[T]he issue is whether the error was harmless beyond a reasonable doubt." *Perez,* 870 F.2d at 1229; *see United States v. Hasting,* 461 U.S. 499, 510–11, 103 S.Ct. 1974, 1981–82, 76 L.Ed.2d 96 (1983); *Dortch v. O'Leary,* 863 F.2d 1337, 1344 (1988), *cert. denied,* 490 U.S. 1049, 109 S.Ct. 1961, 104 L.Ed.2d 429 (1989). The question of whether the error was harmless in turn depends on the strength of the other evidence against the defendant. *Perez, supra.* In this case the evidence against Ashford included his fingerprints on the checks and a tally corresponding to the checks Austin supplied Procter containing Ashford's nickname and phone number. Together with Ashford's employment as a postal worker with ready access to the kinds of checks he was charged with stealing and selling, this evidence is so overwhelming that we can say

---

**4.** Ashford directs us to the following comments:
PROSECUTION: [Discussing paper found on Austin] It's a contract. It's a deal. And there is absolutely—those items are the things that Mr. Cunniff will not be able to explain. Look him right in the eye when he gets up here and starts talking about other things—
DEFENSE: Objection, Judge. Improper argument.
THE COURT. Sustained.
PROSECUTION: —look directly into Mr. Cunniff's eye, and by looking at him, smile at him, and by that smile you will tell him to talk about those fingerprints.
DEFENSE: Objection, Judge. Improper argument.

THE COURT: Sustained.

    \*    \*    \*    \*    \*    \*

PROSECUTION: Look at the ZIP Codes, look at the sequential order. These checks were all taken together at the Post Office. And they were taken by that individual, the only one who had access to those checks.
And you can prove that—or you can see that he did touch these checks, he did touch the checks, so smile at Mr. Cunniff and—
DEFENSE: Objection, Judge.
THE COURT: Well, sustained.
Transcript at 437, 440.

that the prosecutor's comments amounted to harmless error.

## VI.  CONCLUSION

For the foregoing reasons, the defendant's convictions are

AFFIRMED.

BAUER, Chief Judge, concurring.

I concur in Judge Flaum's excellent and detailed opinion.  I write, then, only to express my strongly held belief that criminal justice, if it is to be effective at all as a detriment, must be administered in hot blood; that is, as close to the criminal act as possible.  All speedy trial acts and statutes of limitation aside, criminal prosecutions have a salutary effect on the individual defendants and the community at large when the process is sure and swift.  The long delay between crime and punishment betokens an attitude that the agencies established to protect society from crime are both disinterested and leisurely about their business.

Neither is true, I am aware, and there well may be some perfectly valid reason for the long delay in the present case.  Nevertheless, no reason appears on the record—and perhaps that too has logical and sensible explanation—but the perception of swiftness, fairness, and sureness that engenders respect for the law and its agencies by the public and offenders alike is not enhanced by such severe delays between the arrest and trial.

We depend on public acceptance of the rule of law to keep society from tearing itself apart.  Speed in execution of the law gives strength to the faith in its usefulness so necessary for a self-governing nation.