**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles HORTMAN, Defendant–
Appellant.**

No. 02–3324.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 10, 2003.

Decided Nov. 6, 2003.

 

Gail Joy Hoffman, Michelle L. Jacobs, Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee.

Kirsten K. McWilliams, Rockford, IL, for Defendant–Appellant.

Before MANION, EVANS, and WILLIAMS, Circuit Judges.

### ORDER

Charles L. Hortman was convicted of various drug offenses, money laundering offenses, and gun charges. He appeals and argues that he was deprived of a fair trial because the prosecutor allegedly commented on his right not to testify and vouched for a government witness during closing argument. As to his sentence, he asserts that the district court erred in its calculation of the drug quantity and in its imposition of a two-level enhancement for possession of a firearm in proximity to a drug offense. We find that the defendant was afforded a fair trial, the district court correctly calculated the drug quantity and properly enhanced defendant's offense level, and therefore, affirm Hortman's convictions and sentence.

### I. BACKGROUND

On November 6, 2001, Charles L. Hortman was found guilty of three offenses: (1) conspiring to possess with intent to distribute and possession of over five kilograms of cocaine from on or about May 1994 to August 1999, in violation of 21 U.S.C. §§ 846 & 841(a)(1), and 18 U.S.C. § 2; (2) conspiring to commit money laundering and money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(1), (B)(k), (h) & (2); and (3) being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) & (2). He was sentenced to 360 months imprisonment and five years of supervised release.

During his two week trial, the government called approximately 39 witnesses, including several co-conspirators, informants, and law enforcement officers. The government also presented taped conversations between the defendant and co-conspirators during which he discussed ordering several kilograms of cocaine from an informant. Law enforcement agents also testified about the events of July 29, 1999, when the government seized approximately $31,000, over 600 grams of cocaine, and a Glock pistol from a Manchester Suites hotel room which was being occupied by the defendant and his girlfriend. This event lead to his arrest, when he was found with over $900 and over 2 grams of cocaine on his person.[1]

## II. ANALYSIS

### A. Rebuttal Closing Argument

 Hortman argues that the government was guilty of making several improper statements during its rebuttal closing argument. He claims the first two statements indirectly commented on his right not to testify in violation of *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), while the third improperly vouched for a government witness. He contends that these statements were so egregious as to deprive him of a fair trial and mandate reversal of his convictions. This court bifurcates its analysis of potential prosecutorial misconduct between alleged errors with constitutional implications and more general misconduct, such as vouching. *United States v. Cotnam*, 88 F.3d 487, 497 (7th Cir.1996).

### 1. Defendant's Right Not to Testify

Hortman contends that the prosecutor improperly commented on his decision not to testify during the rebuttal closing argument by making the following comments:

> MS. HOFFMAN: [ ... ] I think that what's notable is what Mr. Coffey did not talk to you about in his statement to you. It's very easy to attack the witnesses that we've put up. And I'll get into that later. But Mr. Coffey made no mention of Manchester Suites when Sheneala Gilmer and the defendant were in room 126—were connected to room 126 with 615 grams of cocaine, the view finder with Sheneala and his kid's pictures, the packaging material, the gun, the baby paraphernalia, the clothing connected to him, no mention of that at all.
>
> MR. COFFEY: Judge, I'm going to object. I'm not obligated to respond to anything the government has said or any element of any offense charged.
>
> THE COURT: Okay. Please proceed.

(Trial Trans. at 1325.) The government then proceeded to summarize the evidence, focusing on one instance when the defendant was stopped by police and found with identification containing an alias as well as over $10,000 in cash.

> MS. HOFFMAN: Take your common sense into the jury room with you. You can look at the testimony, the transcripts, the tape recordings, the video, the documents. This is all consistent with a drug dealer. This man has not earned more than $100 legitimately during the entire period of the conspiracy. And yet, he's stopped with large sums of money. Every time he's stopped he has

---

1. The government offered evidence that: (1) in 1996, over $8,000 and false identification was seized from the defendant at a Wisconsin airport; (2) in 1997, over $181,000 was seized from a storage shed in the defendant's father's home; and, (3) in 1998, over $67,000 was recovered from the defendant's vehicle during a routine speeding stop. Finally, the government also produced the defendant's Social Security records which revealed Hortman's reported earnings from 1995 to 1998 to be under $105.

large sums of money on him. When he's pulled from the back of the car when the car rested against the light pole, he has $900. At Manchester Suites he has $900 in his pocket. When he's at the airport he has $8,000. He has—Franklin County in Illinois he has $600 or $900 on him. This is a man with large sums of money and no explanation, other than the explanation that you've heard in court today, and that is drug dealing. There is no other explanation in the record for—

MR. COFFEY: Judge, I object. He is not obligated to explain—

THE COURT: All right. The burden of proof is on the government; however, the jury is entitled to draw inferences from the facts. Please proceed.

(*Id.* at 1326–27.)

Within the context of the Fifth Amendment, a prosecutor may not make direct or indirect reference to a defendant's decision not to take the stand. *Griffin,* 380 U.S. at 615. An indirect statement involves a prosecutor's description of the government's evidence as "uncontroverted" "unrebutted," "uncontradicted," or "undisputed." Such a comment violates a defendant's right not to testify if it is highly likely that the defendant is the only person able to contradict, rebut, or dispute the government's assertion. *Cotnam,* 88 F.3d at 497. This court has also recognized that when the defendant is the only voice of contradiction, whether the failure to rebut is articulated as the defendant's direct failure or defense counsel's failure, the effect may be prejudicial. *United States v. McClellan,* 165 F.3d 535, 547 (7th Cir.1999). Specifically, a Fifth Amendment violation has occurred

when 1) it was the prosecutor's manifest intention to refer to the defendant's silence, or 2) the remark was of such a character that the jury would "naturally and necessarily" take it to be a comment on the defendant's silence.

*Rodriguez v. Peters,* 63 F.3d 546, 561 (7th Cir.1995) (quoting *United States v. Donovan,* 24 F.3d 908, 916 (7th Cir.1994)).

If a constitutional violation is found, the court will then conduct a harmless error analysis. Under this analysis, a new trial is warranted if the error has a "substantial and injurious effect or influence on determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Thus, "[c]omments about a defendant's failure to testify do not necessarily mandate reversal [...] The issue is whether the error was harmless beyond a reasonable doubt." *United States v. Ashford,* 924 F.2d 1416, 1425 (7th Cir.1991). Rather than look myopically, this court analyzes the trial as a whole placing great weight on the presence of curative jury instructions, *United States v. Cornett,* 232 F.3d 570, 575 (7th Cir.2000), as well as the strength of the evidence against the defendant. *Ashford,* 924 F.2d at 1425.

Under the first step of the analysis, we do not find that a constitutional violation has occurred. In the context of indirect comments such as the ones at issue, the defendant cannot state a claim for a Fifth Amendment violation because he was not the only witness available to rebut the government's assertions. *McClellan,* 165 F.3d at 547. The availability of another witness undercuts the possibility that a jury would "naturally and necessarily" connect the government's comments to defendant's silence.

Defendant's reliance on *McClellan* is misplaced. In *McClellan,* like the case at bar, during closing arguments the government attacked defense counsel's failure to "deny" certain evidence presented by the government. *Id.* However, this court found no constitutional violation because

the defendant's girlfriend was available to testify to rebut the government's statements. *Id.* Here, the government addressed Mr. Coffey's failure to mention the evidence found in the Manchester Suites hotel room. The record is clear that Mr. Hortman's girlfriend, Sheneala Gilmer, was also present in the hotel room and was available to rebut the government's contentions. Therefore, Mr. Hortman was not the only person able to contradict the government's statements concerning the Manchester Suites. *See Cotnam,* 88 F.3d at 497. The defendant attempts to distinguish its case from *McClellan* on the grounds that the girlfriend in *McClellan* was also a co-conspirator making her better able to rebut the government's statements. This is a distinction without a difference. The issue is whether Ms. Gilmer could have rebutted the particular issue presented by the government and as the record indicates she was able to do so.

The government's statements concerning defendant's failure to explain the large sums of money in his possession also could have been explained by calling a third-party witness.[2] Money is not earned in a vacuum. Presumably, when a transaction between two people is involved; there is a giver and receiver. The defendant could have secured the testimony of a witness able to testify as to the source of the money other than himself. Thus, defendant has failed to state a Fifth Amendment violation.

Even if this court were to find the government's statements improper, the defendant's claim would still fail because we find that any such error was harmless beyond a reasonable doubt. *See Ashford,* 924 F.2d at 1425. First, the court gave a curative instruction, counseling the jury that the burden of proof was on the government, not the defendant. This court assumes that juries follow instructions, *see Rodriguez,* 63 F.3d at 561, thereby diminishing any potential prejudice to the defendant. *See Cornett,* 232 F.3d at 575. Second, as discussed above, the evidence of defendant's guilt was overwhelming. *See United States ex rel. Burke v. Greer,* 756 F.2d 1295, 1302 (7th Cir.1985) ("[T]he case against the defendant must be 'overwhelming' in order to apply the harmless error rule."). Based on the foregoing, we find that any possible error was harmless.

2. Vouching

▄ Hortman also argues that the government impermissibly vouched for one of its witnesses, Michael Jackson by stating:

MS. HOFFMAN: Mr. Coffey also spoke about some informants, Michael Jackson, that is. Michael Jackson only testified to what he knew. He didn't say—he didn't stretch it. He testified to the facts. And there's corroboration for this.

(Trial Trans. at 1329.) The government then supplied the jury with evidence of corroborative testimony from other wit-

---

**2.** Though it might have been more prudent for the government to summarize the evidence without referencing defense counsel's omissions, we also find that the government's response was invited by defense counsel's request that the jury imagine his rebuttal to any of the government's statements. Mr. Coffey stated, "[i]f [the government] attacks something I have said, when you go back to deliberate I can only ask you on behalf of Mr. Hortman that you think about the evidence

and think about what would Coffey have said if he had a chance to respond relying on the evidence." (Trial Trans. at 1324.) Analyzing the trial as a whole, the defendant partially opened the door that the government injudiciously walked through. *See United States v. Hubbard,* 61 F.3d 1261, 1268 (7th Cir.1995) (reasoning that the court must assess the context of remarks to determine whether the defendant has suffered any harm).

nesses which supported Mr. Jackson's testimony.

Vouching for the credibility of a witness is characterized as a more general type of prosecutorial misconduct, causing us to first determine whether the statement was improper, and if necessary, we then proceed to an analysis of the effect of the statement on the fairness of the trial as a whole. *United States v. Graham*, 315 F.3d 777, 781–82 (7th Cir.2003). We review the following five factors when assessing the fairness of the trial as a whole: (1) the nature and seriousness of the misconduct; (2) the extent to which the comments were invited by the defense; (3) the extent to which any prejudice was ameliorated by the court's instruction to the jury; (4) the defense's opportunity to counter any prejudice; and (5) the weight of the evidence supporting the conviction. *United States v. Amerson*, 185 F.3d 676, 686 (7th Cir. 1999). Vouching occurs when a prosecutor expresses a "personal belief in the truthfulness of a witness" or implies that "facts not before the jury lend a witness credibility." *Id.* A prosecutor may, however, "draw reasonable inferences from the evidence adduced at trial, even so far as to call a defendant a liar if the record supports that accusation." *United States v. Andreas*, 216 F.3d 645, 671 (7th Cir.2000). As Hortman did not object to these statements at trial, we review them for plain error. Thus, he must show that these errors were not only improper and deprived him of a fair trial but also that the outcome of the trial would have been different absent the remarks. *Graham*, 315 F.3d at 782.

When analyzed in a vacuum, it may appear that the government improperly inserted a personal belief in Mr. Jackson's truthfulness; however, when viewed in the context of defense counsel's statements, the statement was permissible. During his closing argument defense counsel stated "[n]ow, Michael Jackson, I asked him at one point, he smiled and said, oh, it's your theatrics. He's entitled to his opinion. I despise people like Michael Jackson. You don't have to adopt the same opinion I do. But I get angry when I see an opportunist like Michael Jackson taking advantage, because Michael Jackson is not anybody anybody can believe." (Trial Trans. at 1313.) Thus, defense counsel first interjected his personal belief concerning Mr. Jackson's credibility. More importantly, the government followed these statements with evidence it deemed corroborative of Mr. Jackson's testimony. Therefore, the statements "he didn't stretch it. He testified to the facts," served as an introduction to the government's summary of the evidence. "[T]he government is allowed to comment on the credibility of a witness ... as long as the comment reflects reasonable inferences from the evidence adduced at trial rather than personal opinion." *United States v. Morgan*, 113 F.3d 85, 90 (7th Cir.1997) (quoting *United States v. Goodapple*, 958 F.2d 1402, 1409–10 (7th Cir. 1992)).

As we mentioned earlier, even if this court were to find the government's statements improper, as previously discussed, the evidence of Hortman's guilt was overwhelming. Under the plain error standard, the defendant is unable to prove that these comments deprived him of a fair trial. Nor is he able to show that but for these comments the outcome of the trial would have been different. In light of the foregoing analysis, we find that the defendant was not deprived of a fair trial and his convictions stand.

### B. Sentencing

We accord great deference to a district court's sentencing determinations as the district court is better able to make credi-

bility determinations and is intimately connected to the facts of the case. *United States v. Berthiaume,* 233 F.3d 1000, 1002 (7th Cir.2000) (internal citations omitted). Thus, Hortman faces an uphill battle in his attempt to undermine the district court's findings. After careful review of the record, we find that he has not met his burden.

1. Drug quantity

██ Hortman challenges the district court's calculation of the quantity of drugs involved in the underlying conspiracy. We review the district court's determination of the quantity of drugs attributable to the defendant for clear error. *United States v. James,* 113 F.3d 721, 730 (7th Cir.1997). Thus, the issue is whether the government was able to prove by a preponderance of the evidence using reliable information that the defendant was responsible for 50 to 150 kilograms of cocaine. *Id.* Furthermore, for the purposes of sentencing, the defendant, as a participant in a drug conspiracy, is responsible for all "reasonably foreseeable" drug transactions and any conduct of co-conspirators in furtherance of the conspiracy. *United States v. Vega–Montano,* 341 F.3d 615, 615 (7th Cir.2003) (per curiam) (internal citations omitted); *see also* U.S.S.G. § 1B1.3(a)(1)(B).

Defendant was convicted of the conspiracy charge which encompassed activities dating from May 1994 to August 1999. To establish the factual basis for determining the drug quantity, the trial court credited the testimony of three witnesses, stating the following on the record:

> Victoria Edwards testified that on three occasions she delivered drugs to the defendant; five kilograms the first time, five kilograms the second time, and four kilograms the third time. She also had seven kilograms intended for defendant when she was arrested at the airport. This is a total of 21 kilograms. Michael Jackson's testimony indicated that defendant transported six kilograms of cocaine provided by Darrington Sampson, that he middled the deal between defendant and another individual for ten kilograms, and that he received a total of 50 kilograms from Brent Denard when defendant was present. Clowers testified that defendant delivered six or seven kilograms. Cash seized from the storage locker where defendant's prints were found in the amount of $181,000 converts to nine kilograms. [...] So this is a total right there of 103 kilograms. Based on the testimony adduced at trial, and the amount attributable to co-defendants, especially Terri Edwards, this may in fact be too low. But I have concluded that sufficient reliable evidence has been presented to convince me by a preponderance of the evidence that defendant is responsible for 50 to 150 kilograms of cocaine.

(Sent. Trans. at 19–20.)

The defendant's assignments of error are without basis. First, the defendant contends that the district court failed to make sufficient "particularized findings" concerning the scope of the conspiracy; however, the scope of the conspiracy was defined in the indictment. Furthermore, the district court focused on the testimony of three witnesses to sustain its finding. We find that the record evinces a well thought out and particularized basis for the court's determination of the drug quantity. Furthermore, based on the evidence as a whole, the district court was rather conservative and generous to the defendant.

Second, defendant argues that the 60 kilograms established by Michael Jackson's testimony was not in furtherance of the conspiracy. Defendant, however, fails

to point to any evidence in the record to support this naked assertion.[3] Rather, the record reveals that the 60 kilograms purchased through Michael Jackson represent relevant conduct attributable to the same conspiracy as it was "connected [...] by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" *United States v. Acosta,* 85 F.3d 275, 281 (7th Cir.1996) (quoting U.S.S.G. § 1B1.3(a)(2), cmt n. 9(A)). Thus, there is no plain error with regard to the drug quantity.

### 2. Firearm possession in proximity to a drug offense

Under United States Sentencing Guideline § 2D1.1(b)(1), a defendant's base offense level must be increased by two points if he is deemed to "possess" a firearm during the commission of an offense involving drugs "unless it was clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b)(1), application note 3.[4] Though the gun need not be connected to the charged offense, the government must prove, by a preponderance of the evidence, that the gun was possessed during the commission of the offense or the relevant conduct. *United States v. Cain,* 155 F.3d 840, 843 (7th Cir.1998). If the government is able to make such a showing, the burden is then shifted to the defendant to show that it was "clearly improbable" that the gun was possessed during the charged offense. *Id.*

This court reviews a district court's finding of "possession" for clear error. *Berthiaume,* 233 F.3d at 1002. The district court found that "[a] loaded gun was found in the hotel room where defendant was staying, along with drugs and money." The court then reasoned that due to the proximity of the gun to the seized drugs, "the clear implication is that the gun was there to protect the drugs and the money." (Sent. Trans. at 21.)

In *Cantero,* this court highlighted several factors which support applying this enhancement: (1) the possession of a handgun as opposed to a rifle; (2) the weapon's close proximity to the seized drugs; and (3) a charge of conspiracy to possess as opposed to a single-offense drug transaction. *See* 995 F.2d at 1410 (internal citations omitted). This case presents all three bases found in *Cantero.* The police recovered a loaded Glock semi-automatic pistol, 615 grams of cocaine, a scale, and over $31,000 from the Manchester Suites hotel room, which the defendant was seen entering and exiting. In support of his contention that it was "clearly improbable" that he possessed the handgun during the course of this drug conspiracy, he cursorily states "[t]here was also testimony that hotel employees had access to the room, and that there was confusion regarding access to the room." (Appellant's Brief at 15.) We find that the defendant has not satisfied his burden. The district court's finding is fully supported by the evidence and therefore there was no clear error.

---

**3.** This argument may be waived. *See United States v. South,* 28 F.3d 619, 629 (7th Cir. 1994) ("[p]erfunctory and undeveloped arguments ... are waived").

**4.** The application note gives the following example of a situation in which an enhancement would not be warranted; "the enhancement would not be applied if the defendant,

arrested at his residence, had an unloaded hunting rifle in his closet." *Id.* This court generally limits the applicability of note 3 to the identical facts stated therein. *See United States v. Cantero,* 995 F.2d 1407, 1410 (7th Cir.1993) (citing *United States v. Garcia,* 925 F.2d 170, 173 (7th Cir.1991)).

## III. CONCLUSION

For the foregoing reasons, we AFFIRM.