UNITED STATES of America,
Plaintiff–Appellee,

v.

Vasilios ANAGNOSTOU, Defendant–
Appellant.

No. 91–3263.

United States Court of Appeals,
Seventh Circuit.

Argued May 28, 1992.

Decided Sept. 10, 1992.

Rehearing Denied Oct. 27, 1992.

**940**

Barry R. Elden, Asst. U.S. Atty., Haywood E. McDuffie (argued), Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Robert H. Aronson, Chicago, Ill., argued, for defendant-appellant.

Before CUMMINGS and FLAUM, Circuit Judges, and LEE, District Judge.*

FLAUM, Circuit Judge.

A jury convicted Vasilios Anagnostou of using an explosive device to destroy his restaurant, 18 U.S.C. § 844(i), and of mail fraud for filing an insurance claim to collect on the resulting property loss. 18 U.S.C. § 1341. On appeal, Anagnostou contends his due process rights were violated by a nearly five-year delay between the explosion and his indictment, and also challenges the sufficiency of the evidence and the jury instructions. We affirm.

* The Honorable William C. Lee, District Judge for the Northern District of Indiana, sitting by

## I.

In 1977, Anagnostou opened the Honey Bee Snack Shop (the restaurant) in Mount Prospect, Illinois, which he owned and operated for the next eight years. On the afternoon of November 25, 1985, Peter Anthony, an old friend and regular patron, entered the restaurant to have a cup of coffee. Anagnostou told Anthony that he thought there might be a problem with his kitchen stove owing to a gas odor emanating from the kitchen earlier that day. Anthony, who had experience as a general contractor and carpenter, thought that the "flex" pipe on the back of the stove looked old, and told Anagnostou they should replace it. After picking one up at a hardware store across the street, Anthony, using some wrenches from his car, replaced the pipe and completed his work by 5:00 p.m. The staff left by 10:00 p.m. and Anagnostou and his family closed the restaurant by 10:30 p.m.; after stopping off to see his accountant, Anagnostou went home to bed.

Just two hours later, at approximately 12:30 a.m., an enormous explosion destroyed the restaurant. Firefighters extinguished the blaze, bulldozing the front of the building in the process, and local fire investigators and agents from the federal Bureau of Alcohol, Tobacco, and Firearms (ATF) immediately began an investigation into its cause. They suspected a natural gas explosion from the start: a witness observed a fireball, the roof had been blown off, brick walls were knocked down, and debris scattered more than 100 feet. Investigators traced the main gas line into the building and to the kitchen, where it supplied all of the appliances in the restaurant through flex pipes connected to the main line. The pipe entered the restaurant through the wall behind the stove. Investigators discovered the stove resting roughly one foot away from the wall with the gas shut-off valve removed from the protruding main gas line and laying on the floor behind the stove. Threads on the pipe

designation.

were all intact and the valve assembly had a fresh tool mark on it. Fire investigators removed the pipes and valve assembly and forwarded them to a laboratory in Washington, D.C., for further examination.

ATF agents interviewed Anthony on December 10, 1985, and again on February 11, 1986, to determine what he did behind the stove. Anthony told them that he replaced only the stove flex pipe and did not disconnect any other valve or pipe; after replacing the flex pipe, he tightened it with a wrench and then lit a match to make sure the connections were properly sealed. He further told investigators that he did not detect the smell of gas after completing his repairs. Investigators also learned from others that by 5:00 p.m. the stove had been pushed back against the wall, that the restaurant's cook, James Alikakos, then used the stove without any problems, and that neither he nor anyone else noticed the smell of gas in the kitchen.

As the investigation unfolded, evidence suggested that Anagnostou might have deliberately set-off the explosion. Just weeks before, Anagnostou received word from his insurance agent that the company insuring his restaurant had sent out a non-renewal notice, terminating coverage on December 1, 1985. Other evidence indicated that Anagnostou's business and personal finances were in decline and that he exhibited unusual behavior on the day of the explosion.

A federal grand jury returned a two-count indictment against Anagnostou on November 14, 1990. As will soon become relevant, Anthony died just one month later, on December 16. After a six-day trial in July 1991, a jury convicted Anagnostou on both counts. The district court sentenced Anagnostou to 36-months imprisonment and three years probation, and stayed the sentence pending the outcome of this appeal.

## II.

Anagnostou's principal contention is that a delay of nearly five years between the restaurant explosion on November 26, 1985, and the return of the indictment on November 14, 1990, substantially prejudiced his defense because of Anthony's death in December 1990 and his resulting unavailability at trial. Anagnostou asserts that Anthony would have explained exactly what he did behind the stove and possibly admitted to disconnecting the main shut-off valve, exonerating Anagnostou of the crime or at least creating a reasonable doubt in the minds of the jurors. He adds that Anthony would have created additional doubt by admitting on the stand that he had limited plumbing experience, and suffered from ailing health and poor eyesight. Anagnostou first made this due process argument in a pre-trial motion to dismiss, which the district court denied.

Although statutes of limitation are the primary safeguard against the potential prejudice—i.e., faded memories, lost evidence, unavailable witnesses—that attends stale criminal charges, the due process clause plays a limited role in protecting against oppressive prosecutorial delay. *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977); *United States v. Ashford*, 924 F.2d 1416, 1419 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 98, 116 L.Ed.2d 69 (1991). Limited, indeed, for in the twenty-five odd cases we have heard raising this claim, we have never found a pre-indictment delay that rose to the level of a constitutional violation. *See United States v. Strauss*, 452 F.2d 375 (1971) (first case), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (1972); *Ashford*, 924 F.2d at 1419 (most recent case). Thus, only the most egregious pre-indictment government delay—that which transgresses "fundamental conceptions of justice" and "the community's sense of fair play and decency," *Lovasco*, 431 U.S. at 790, 97 S.Ct. at 2049—is proscribed by the constitution. A pre-indictment delay constitutes a due process violation if 1) the delay caused "actual and substantial prejudice" to the defendant's right to a fair trial, and 2) the government delayed the indictment for tactical advantage or some other impermissible reason. *Ashford*, 924 F.2d at 1419–20. In satisfying the prejudice prong of this

test, it is not enough to show the mere passage of time nor to offer some suggestion of speculative harm; rather, the defendant must present concrete evidence showing material harm.[1] *See, e.g., United States v. Nichols,* 937 F.2d 1257 (7th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 989, 117 L.Ed.2d 151 (1992); *United States v. Antonino,* 830 F.2d 798, 805 (7th Cir. 1987). Hence, to show prejudice in the context of an unavailable witness, the defendant must offer some grounds for his belief that the absent witness would have helped his case in a material way. *See United States v. Doerr,* 886 F.2d 944, 964 (7th Cir.1989).

■ Here, Anagnostou fails to show that Anthony's unavailability prejudiced his defense. *United States v. Adams,* 834 F.2d 632 (7th Cir.1987), *cert. denied,* 484 U.S. 1046, 108 S.Ct. 783, 98 L.Ed.2d 869 (1988), is instructive. There the defendant maintained that a three-year pre-indictment delay caused prejudice because two potential witnesses had died in the interim. *Id.* at 633. The defendant alleged, without any evidentiary support, that one of those deceased witnesses, a close friend and longtime employer, would have exonerated him by confessing that he actually led the stolen car operation charged in the indictment.

We upheld the conviction, noting that Adams' "naive speculation" that the deceased witness would have taken the blame was insufficient to meet the burden of showing actual and substantial prejudice. *Id.* at 634; *see also Doerr,* 886 F.2d at 964–65. Similarly, Anagnostou speculates that Anthony would somehow have exonerated him had he testified at trial. But there is no evidence to suggest that Anthony would have said anything different from what he told investigators before his death: that he never touched the main gas valve, replaced only the flex pipe, lit a match to check for leaks, and smelled no odor of gas after completing his repairs. Speculation that "something else" may have occurred behind the stove falls short of the concrete showing necessary to prove actual prejudice. *See, e.g., Nichols,* 937 F.2d at 1261. Indeed, Anthony's absence arguably helped Anagnostou by allowing him to speculate at trial and in closing argument that Anthony's negligence might have caused the explosion, speculation that might well have been foreclosed by Anthony's testimony.

■ Turning to the second prong of the pre-indictment delay analysis, Anagnostou concedes that the government did not intentionally delay his indictment to gain an

---

1. We emphasize that this is a case involving pre-indictment delay. The sixth amendment protects defendants from *post-indictment* prosecutorial delay by guaranteeing the accused the right to a speedy trial. The speedy trial clause protects against "oppressive pretrial incarceration," "anxiety," and prejudice to one's defense, *Barker v. Wingo,* 407 U.S. 514, 532, 92 S.Ct. 2182, 2193, 33 L.Ed.2d 101 (1972), the last of which is the most serious, *id.,* and is very similar to the harm against which the due process clause protects in the pre-indictment delay context. Whether a post-indictment delay violates the speedy trial clause depends on the four-part balancing test laid out in *Barker:* the "[l]ength of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530, 92 S.Ct. at 2192 (footnote omitted).

The Supreme Court recently confronted the defendant's burden of proving prejudice under the speedy trial clause in *Doggett v. United States,* —— U.S. ——, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). The accused in *Doggett* endured an 8½ year delay between indictment and trial, but failed to come forward with any concrete proof of actual harm to his defense. The Court held

that after such a lengthy delay prejudice was presumed, and that the defendant did not have to step forward with tangible proof of prejudice. "[P]rejudice is not limited to the specifically demonstrable [and, thus,] affirmative proof of particularized prejudice is not essential to every speedy trial claim." *Id.* —— U.S. ——, 112 S.Ct. at 2692 (citations omitted). The Court added that in cases involving such a lengthy delay, mere negligence, not just bad faith, on the government's part is sufficient to make out a cognizable constitutional claim. *Id.* —— U.S. at ——, 112 S.Ct. at 2693.

Neither party has suggested that the Court's holding in *Doggett* might have some ramifications in the pre-indictment delay context, and we doubt that it does. Aside from the different interests protected by the speedy trial clause and the due process clause, and the different balancing tests applicable in those two contexts, *Doggett* is silent on whether its holding upsets the long-standing requirement that defendants prove both actual prejudice and impermissible prosecutorial motive in establishing a due process violation from pre-indictment delay. *See Lovasco,* 431 U.S. at 789–90, 795, 97 S.Ct. at 2048, 2051.

unfair tactical advantage. Appellant's Br. at 14. Only *bad faith* delay is proscribed by the due process clause, and therefore Anagnostou's concession on this point is fatal to his argument. *Ashford*, 924 F.2d at 1421. We note that even absent that concession, Anagnostou could not have established that the government manipulated the timing of the indictment to gain a tactical advantage because the government obtained the indictment before Anthony died. Indeed, not only was Anthony still alive when the indictment was returned on November 15, 1990, but defense counsel had an opportunity to interview him ten days later.[2] The very premise behind placing limits on prosecutorial delay is the fundamental unfairness in allowing the government to *manipulate* the timing of an indictment for tactical reasons. *Lovasco*, 431 U.S. at 790, 97 S.Ct. at 2049. Here, the sequence of events makes it impossible to conclude that the government purposely delayed the indictment to capitalize on the alleged prejudice (*i.e.*, Anthony's death). Anagnostou has failed to establish either substantial prejudice or impermissible prosecutorial motive and accordingly, the pre-indictment delay did not violate his right to due process of law.

Our holding should not, however, be read to condone a five-year pre-indictment delay; indeed, as Chief Judge Bauer observed in *Ashford*, 924 F.2d at 1426 (concurring opinion), such excessive delays are deeply distressing. The statute of limitations is the defendant's primary safeguard, setting quantitative limits on prosecutorial delay by creating a bright-line rule beyond which charges may not be brought. The due process clause provides back-up protection, setting qualitative limits on delay in individual cases brought within the statute of limitations, yet outside the bounds of fair play. The government here attributes the delay to its excessive workload and to staff turnover that forced reassignment of this case from one Assistant United States Attorney to another. Nothing about that excuse suggests bad faith, but it is hardly a compelling justification for such a long de-

lay. *Cf. United States v. Doubet*, 969 F.2d 341, 347 n. 1 (7th Cir.1992).

### III.

Anagnostou next asserts that the evidence is insufficient to support his conviction. In challenging the sufficiency of the evidence, Anagnostou bears a heavy burden. *United States v. Davis*, 890 F.2d 1373, 1377 (7th Cir.1989), *cert. denied*, 493 U.S. 1092, 110 S.Ct. 1165, 107 L.Ed.2d 1068 (1990). We must uphold the conviction if the evidence, viewed in the light most favorable to the government, establishes that any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Harty*, 930 F.2d 1257, 1265 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 262, 116 L.Ed.2d 215 (1991). In evaluating the evidence, we do not re-weigh the evidence or assess the credibility of witnesses. *United States v. Garner*, 837 F.2d 1404, 1422–23 (7th Cir.1987), *cert. denied*, 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988).

Anagnostou contends that the government based its case entirely on circumstantial evidence, none of which definitively links him to the disconnected gas valve. He argues the jury ignored a host of exculpatory evidence that casts a reasonable doubt on his complicity in the explosion. First, his expert witness opined that the explosion might have been caused by a natural underground pipe leak, and that it was possible for the gas pipes to have pulled apart during the explosion without stripping the pipe threads. Second, Anagnostou takes issue with the inferences the government asked the jury to draw from his financial situation and conduct leading up to the explosion. He points out, for example, that several vendors testified they made deliveries to his restaurant in the weeks prior to the explosion, suggesting that his finances were not so precarious and that he had no plans to put an abrupt

---

**2.** We note that nothing suggests Anthony divulged any new information during that inter-view or in any way deviated from his previous statements to investigators.

end to business. He claimed, too, that he was never under the impression from his insurance agent that obtaining new coverage would be a problem. Finally, Anagnostou points to other evidence that creates doubts about his guilt. He argues, for example, that Anthony's medical records revealed that Anthony had a bone disorder, a nerve disease, and poor eyesight, any of which could have caused him to accidentally open or damage the main gas line.

■ Anagnostou's argument boils down to an invitation to second-guess the jury, something we are not entitled to do unless the record is barren of any evidence supporting the government's case. *United States v. Jackson*, 935 F.2d 832, 840 (7th Cir.1991). The government's case may have lacked direct evidence, but it consisted of ample circumstantial evidence to support Anagnostou's conviction. *See United States v. Lundy*, 809 F.2d 392, 396 (7th Cir.1987) (circumstantial evidence just as relevant as direct evidence in establishing guilt or innocence); *United States v. Bradshaw*, 719 F.2d 907, 921 (7th Cir.1983) (same). That evidence included proof of motive and opportunity to commit the crime, circumstantial evidence linking him to the explosion, and expert opinion that the explosion was not an accidental one.

Regarding motive, the jury heard extensive evidence of Anagnostou's mounting financial difficulties. His landlord testified that he was often delinquent in paying his rent, and that in 1980 he sued Anagnostou for four months back rent. His accountant testified to the restaurant's debts and outstanding state and federal tax obligations; he also testified that Anagnostou had borrowed on his credit cards to keep the restaurant afloat. His insurance agent testified that he notified Anagnostou that his insurance was not being renewed and would expire on December 1, 1985, and called him several times in November to say that he was unable to find a replacement policy because of a very tight insurance market.

The jury also heard evidence of Anagnostou's uncharacteristic behavior on the day of the explosion. One of the restaurant's waitresses testified that when the exterminator arrived at the restaurant on November 25, Anagnostou sent him away, and that he sent her home early that evening, telling her not to refill the condiment containers on the tables, one of her regular closing duties. She further testified that as she left the restaurant on November 25, she saw Anagnostou and his family removing boxes of food and restaurant supplies from the rear of the restaurant. Another waitress testified that Anagnostou rushed her to leave the restaurant on November 25. Anagnostou's abnormal behavior supports an inference that he was preparing to execute the alleged scheme to destroy the restaurant.

The jury also heard from several expert witnesses, all of whom made conclusions linking Anagnostou to the explosion. An arson specialist testified that the disconnected gas pipes were not pulled apart by the force of the explosion: the pipe threads were not stripped, grease on the pipe threads indicated they had been unscrewed, and fresh marks on the pipes indicated they had been opened with a wrench. He further testified that the physical evidence eliminated other possible sources for the leak, such as the restaurant furnace, leaking pipes, or open burners on the stove. He added that the explosion could not have been caused by a natural underground leak, as Anagnostou's expert alleged, because the restaurant was built on a concrete slab, concluding that the explosion could only have been caused by a large accumulation of gas from the main gas line which was eventually ignited by an electrical spark or pilot light on one of the kitchen appliances. An explosion analysis found that the volume of air in the restaurant was about 15,000 cubic feet and that, based on the magnitude of the explosion, at least 900 cubic feet of gas had accumulated in the building when it ignited. Given the pipe configuration and the average flow of natural gas in suburban Chicago, he estimated the gas had been leaking from the main line for at least one hour. A specialist in firearms and tool mark identifications testified that he conducted a microscopic analysis of Anthony's wrenches and con-

cluded that they did not make the fresh tool mark that had been found on the main gas pipe. He also opined that the direction of the tool marks indicated that the main gas pipe had been intentionally loosened with a wrench.

Finally, the government presented evidence that Anagnostou was the only person with the opportunity to commit the crime. Someone intentionally removed the shut-off valve from the main gas line, and Anagnostou was the logical suspect; he was the last one to leave the restaurant and there were no other occupants or tenants in the building. It couldn't have been Anthony because, after his repair job, the stove worked fine and no one detected the smell of gas. The experts agreed that the size of the leak was such that anyone passing the stove would have heard or smelled the escaping gas had the valve been left open during the day. The jury also saw a transcript of Anagnostou's testimony in a civil deposition in which he stated that he did not believe Anthony had anything to do with the explosion and that Anthony changed only the flex pipe and did not work on the main gas line. Lastly, the evidence showed that Anagnostou stood to collect as much as $250,000 under the restaurant's insurance policy.

Anagnostou maintains that the evidence presented was insufficient to preclude the *possibility* that Anthony or natural causes caused the explosion. He also goes down the list of witnesses raising a series of questions about their credibility; he calls one of the expert witnesses a "hired gun" of the insurance company, Appellant's Br. at 28, he asserts that "the jury totally ignored [his expert's] testimony," *id.* at 49, that his former insurance agent was obviously "lying to the jury," *id.* at 42, that the prosecution "totally failed to prove that the business was in trouble," *id.* at 36, and that no one can "say beyond a reasonable doubt that Peter Anthony did not loosen the main pipe." *Id.* at 24. Of course, he made these same arguments to the jury, all of which presented issues of witness credibility that it was free to reject. *United States v. Beverly*, 913 F.2d 337, 358 (7th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 766,

112 L.Ed.2d 786 (1991). The government presented plenty of evidence from which the jury could reasonably infer that Anagnostou caused the explosion. As the district court noted in denying Anagnostou's motion for a new trial, the government presented such "a massive amount of circumstantial evidence" that a jury could fairly view Anagnostou's guilt "as having been established by overwhelming evidence." Tr. at 5 (July 22, 1991).

## IV.

■ Finally, Anagnostou makes two challenges to the jury instructions. First, he asserts that the trial judge committed reversible error in instructing the jury on a jurisdictional element of 18 U.S.C. § 844(i), which requires that the building destroyed be one "affecting interstate commerce." Jury Instruction No. 18 read:

If you find that the government has proved beyond a reasonable doubt that the Honey Bee Restaurant bought and sold products produced outside of the State of Illinois then I instruct you as a matter of law that the building containing the Honey Bee Restaurant and the personal property therein were used in activities affecting interstate commerce.

Appellant's Br. at 5 (appendix). Anagnostou maintains that this instruction violated his right to due process by removing the government's burden to prove all elements of the crime. We disagree.

Besides the fact that this instruction correctly states the law, *see, e.g., United States v. Sweet*, 548 F.2d 198, 202 (7th Cir.) (tavern that purchased beer from out-of-state vendor satisfied the interstate commerce element in a firebombing case), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977), and is one we have approved in the past, *see United States v. Zabic*, 745 F.2d 464, 474 (7th Cir.1984) ("affecting interstate commerce" element established by even *de minimis* impact on interstate commerce), the district court provided it to the jury in this case to clarify earlier confusion created by defense counsel. At trial, the government had introduced testimony to establish that the res-

taurant purchased Old Style beer, a product produced and shipped into Illinois from Wisconsin, satisfying the interstate commerce element of § 844(i). In cross-examining the government witness, defense counsel sought to pursue a theory that the beer might have somehow "left the stream of commerce" before coming to the restaurant. The government objected to this line of questioning, but the court permitted it, expressing skepticism about the theory and informing defense counsel that a corrective instruction might be necessary if the theory turned out to lack merit. Defense counsel later admitted that he could find no authority for his position and, accordingly, the trial judge acted properly in giving this corrective instruction.

Second, Anagnostou asserts that the trial judge committed reversible error by instructing the jury that a conspiracy might have existed when no conspiracy was charged in the indictment. Jury Instruction No. 15A provided: "A defendant need not personally perform every act constituting the crime charged. Every person who willfully participates in the commission of a crime may be found guilty." Appellant's Br. at 4 (appendix). Anagnostou argues that this instruction invited the jury to speculate that a conspiracy existed between Anagnostou and Anthony, despite the fact the indictment contained no conspiracy charge. This contention lacks merit.

The challenged instruction is a pattern instruction approved by this Court, and, more importantly, does not contain the word "conspiracy." Anagnostou was charged with using the mails in devising a "scheme to defraud," making it appropriate to instruct the jury that Anagnostou need not have personally performed every act comprising the scheme. The government did not request a conspiracy instruction and nothing indicates the challenged instruction invited the jury to speculate about the existence of a conspiracy.

AFFIRMED.