**UNITED STATES of America,**

v.

**A. Guy CROUCH, III, and Michael J. Frye.**

**Cr. No. G–92–22.**

United States District Court, S.D. Texas, Galveston Division.

Oct. 18, 1993.

Jimmy Phillips, Angleton, TX, Steven Jay Rozan, Houston, TX, for A. Guy Crouch, III.

Guy Womack, U.S. Attys. Office, Houston, TX, for U.S.

## OPINION AND ORDER

KENT, District Judge.

Before this Court is the Report of the Magistrate Judge recommending that the motions of Defendants Crouch and Frye to dismiss the instant indictment on the basis of undue pre-indictment delay be granted. The Court submits this Opinion and Order, and for the reasons herein stated, the motions are **GRANTED.**

There is no significant dispute about the factual history of this litigation and a general rendition of those facts will suffice for the purpose of this Opinion and Order. In 1984 and 1985, prior to the closure of the Delta Savings Association, Defendants Crouch, Frye, and Shawell were involved in alleged illegal banking transactions now made the basis of this prosecution. Subsequent to the failure of Delta, federal examiners of the Federal Home Loan Board conducted an extensive examination of the bank's records. This investigation resulted in the issuance of a formal referral dated March 10, 1986, recommending a criminal investigation be conducted into the involvement of several individuals in questionable real estate transactions at Delta. The named individuals included, among others, Robert Ferguson, Carl Gerjes, and the three Defendants named in the instant indictment. (Motion of Defendant Crouch, Exhibit "C")

The prosecution of Gerjes was given top priority and culminated in his conviction in 1989. Gerjes was prosecuted again in 1992 and on April 22, 1992 pleaded guilty before this Court and agreed to cooperate with the government in this prosecution. Ferguson was convicted on January 31, 1992; he too pleaded guilty here and agreed to help the government in the prosecution of this indictment.

In March, 1992, the government turned its sights toward Crouch, Frye, and Shawell, and on November 12, 1992, eight years after the alleged transactions and six and one half years after the criminal referrals, the instant indictment was returned. There is no evidence that either Crouch or Frye had any notice they were targets of criminal investigations at any time prior to March, 1992.

Shawell entered a plea of guilty before this Court on May 28, 1993, and, along with Gerjes and Ferguson, has agreed to cooperate with the government against his co-defendants. Crouch and Frye, on the other hand, have steadfastly professed their innocence and each has challenged the indictment as violative of the Fifth Amendment due process clause as a result of the lengthy pre-indictment delay.

The United States Magistrate Judge conducted an evidentiary hearing on the Defendants' motions to dismiss for undue prosecutorial delay and thereafter recommended that the motions be granted and the indictment dismissed. The government promptly filed objections to the Report and Recommendation and Frye has filed a response urging this Court to adopt the recommendation of the Magistrate Judge.

 This Court, having reviewed the relevant pleadings and their attachments,[1] read the transcript of the evidentiary hearing, and given the matter *de novo* review, concludes that the Magistrate Judge reached the proper result and his Report and Recommendation, except as hereinafter modified and supplemented, is **ADOPTED.**

 The Court notes, in passing, that the government sought to avoid the evidentiary hearing in the first instance, arguing it was unnecessary; history has now borne out the impropriety of that position. Interestingly, in an Order dated June 21, 1993, deny-

---

1. The Magistrate Judge apparently confined himself to the record established at the evidentiary hearing and did not consider the exhibits attached to the motions themselves (tr. pg. 50.).

This Court, on the other hand, considers those exhibits to be part of the relevant pleadings and will specifically rely upon them when appropriate to the disposition of this motion.

ing the government's appeal from the order of the Magistrate Judge scheduling the evidentiary hearing, this Court cautioned the government that anything but complete participation in the evidentiary hearing before the Magistrate Judge would not be a wise course to steer.[2] Given the magnitude of its docket, this Court relies heavily on the Magistrate Judge to handle pretrial matters, including evidentiary hearings in felony cases, and it cannot tolerate or condone a conditional approach by trial counsel. Except in extreme circumstances, the evidence offered at an evidentiary hearing before the Magistrate Judge will be the evidence this Court will give *de novo* review; any other approach would simply encourage counsel to hope for victory before the Magistrate Judge while protecting otherwise relevant evidence for use on appeal in the event of an adverse recommendation. Accordingly, having been duly cautioned by written order of this Court, the government's attempt to offer any new evidence through its objections, which it failed to present at the evidentiary hearing, will be ignored.

■■■■ The pivotal issue in this case concerns the proper standard to be applied. The government argues that the Magistrate Judge erred in rejecting the reasoning of *United States v. Lovasco,*[3] 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), in favor of *United States v. Townley,*[4] 665 F.2d 579 (5th Cir.), *cert. denied, Townley v. United States,*

456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982), but given the circumstances of this case, the Magistrate Judge was, in this Court's opinion, correct. The government urged that the *Townley* decision is an "anomaly case which is not the most proper state of the law", (page 48), however, as the Magistrate Judge pointed out, *Townley* is still viable Circuit authority and it post-dates and distinguishes the *Lovasco* approach. 665 F.2d at 582. More importantly, in this Circuit, a panel decision, right or wrong, may not be overruled by another panel, not to mention a District Judge, in the absence of *en banc* consideration or superseding decision of the United States Supreme Court. *Pruitt v. Levi Strauss & Co.,* 932 F.2d 458, *reh'g en banc denied,* 936 F.2d 571 (5th Cir. 1991); *see also Burlington Northern R.R. Co. v. Brotherhood of Maintenance of Way Employees,* 961 F.2d 86 (5th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1028, 122 L.Ed.2d 173 (1993). Nor is this Court, as the government suggests, obligated to follow a decision from a sister circuit.[5] The reasoning of *Townley* is most appropriate in this case.

■■■■ Undaunted, the government then proposed the precise theory flatly rejected by the Fifth Circuit in *United States v. Brand,* 556 F.2d 1312, 1317 n. 7 (5th Cir. 1977), *cert. denied, Brand v. United States,* 434 U.S. 1063, 98 S.Ct. 1237, 55 L.Ed.2d 763

---

**2.** The Order reads, in pertinent part, as follows: "... if the Defendants' evidence convinces the Magistrate Judge that the length of delay prior to the return of this indictment is inexcusable and sufficiently prejudicial, any decision by the government to forego the presentation of evidence of justification will be made at its peril. Should the government elect to forego any meaningful participation at the evidentiary hearing before the Magistrate Judge, it will find little solace before this Court should it seek to introduce such evidence in a *de novo* appeal from an adverse ruling."

**3.** *Lovasco,* the government argues, stands for the proposition that despite prejudice to an accused, a lengthy pre-indictment delay will not violate due process unless the accused can show that the government's delay was intentional and motivated by the government's bad faith desire to gain a tactical advantage over the accused. While this Court does not read *Lovasco* so narrowly, further discussion on this issue is unnecessary.

**4.** *Townley* holds that in the appropriate case the "due process issue relative to the deprivation of a fair trial by lengthy delay ... turns upon whether the degree of prejudice thereby sustained by the accused is sufficiently balanced by the good faith reasons advanced by the government." 665 F.2d at 582.

**5.** The government urges the Court to reject *Townley* in favor of a more recent decision of the Seventh Circuit, *United States v. Anagnostou,* 974 F.2d 939 (7th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1943, 123 L.Ed.2d 649 (1993), but this Court notes that the Seventh Circuit, while following Fifth Circuit authority in the past, has clearly recognized its freedom not to do so, *Richards v. Local 134, Int'l Bhd. of Elec. Workers,* 790 F.2d 633 (7th Cir.1986); this Court is no less free.

(1978), and thereafter in *Townley*, that "governmental interests not amounting to an intentional delay will automatically justify prejudice to a defendant". *Id.,* 665 F.2d at 582. In this Court's opinion, this is not, and should not be, the law. The due process protection of the Fifth Amendment was enacted, as part of the Bill of Rights, to protect citizens from the power of the federal government; it is a restraint on improper governmental action, including prosecution. *Ex parte Wilson,* 114 U.S. 417, 5 S.Ct. 935, 29 L.Ed. 89 (1885). If the due process issue relative to the deprivation of a fair trial because of lengthy pre-indictment delay were to turn upon the need of the accused to show governmental malice, the protections of the Fifth Amendment would be seriously curtailed; especially where, as here, the government successfully resists discovery of the information from investigative files which could confirm or defeat its allegations of good faith and then, despite judicial monition, chooses to rely on only general conclusory evidence to justify an eight-year pre-indictment delay. The Fifth Amendment protects an accused from overly stale charges, it does not insulate the government from the results of its negligence. To apply the *Lovasco* reasoning to the case at bar, on the present record, would be unfair and, in the last analysis, fairness is what due process is all about. *United States v. Shaw,* 555 F.2d 1295, 1299 (5th Cir.1977) (The due process inquiry turns on "whether the prosecution's actions violated 'fundamental conceptions of justice' or the community's sense of fair play and decency.")

■ The government's argument that the statute of limitations should control is also unpersuasive. Even *Lovasco* recognizes that while the statute of limitations provides the primary guarantee against the prosecution of overly stale charges, it does not fully define the defendant's rights with respect to the events occurring prior to the return of the indictment; the due process clause of the Fifth Amendment also has a role to play in protecting against oppressive delay. *See United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Certainly the enactment of 18 U.S.C. § 3293, which extended the applicable statute of limitations from five to ten years, did not abolish the Due Process Clause of the Fifth Amendment. Indeed, when the two are at odds, the statute must succumb to the Amendment. The purpose of the Fifth Amendment is to limit the power of the legislature as well as that of prosecuting officers of the United .States. *Ex parte Wilson,* 114 U.S. 417, 5 S.Ct. 935, 29 L.Ed. 89 (1885).

■ The government complains that the doctrine of "presumptive prejudice" articulated most recently by the Supreme Court in *Doggett v. United States,* — U.S. —, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), is inapplicable to a Fifth Amendment due process claim, but this position seems indefensible. Prejudice is prejudice; it may take many forms, but it does not change in substance. If post-accusation delay of eight and one half years results in a presumption of prejudice in favor of Mr. Doggett, it is difficult to imagine why the eight year *pre*-accusation delay in this case wouldn't come to the aid of Defendants Crouch and Frye. Of the numerous forms of prejudice caused by delay, the most serious is the **possibility** an accused's defense will be impaired by dimming memories and loss of exculpatory evidence. *Doggett,* — U.S. at —, 112 S.Ct. at 2692, 120 L.Ed.2d at 530. As in *Doggett,* these Defendants claim this kind of prejudice, and there is probably no more meaningful kind that they can claim since neither was aware, until shortly prior to return of the indictment, that criminal charges would be brought against him. It is noteworthy that the Supreme Court discussed the role of governmental bad faith in *Doggett* and found that while negligence is to be weighed more lightly than a deliberate attempt to harm the defense, "it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution" and its toleration will vary inversely with the protractedness and consequent threat to the fairness of an accused's trial. *Id.* — U.S. at —, 112 S.Ct. at 2693, 120 L.Ed.2d at 531–2. Memories do not dim over time any less for the purpose of the Fifth Amendment than for the purpose of the Sixth. Indeed, a better argument can be made that the presumption should be even stronger in regard to pre-indictment delay. Once an accused is

charged with an offense, he will, presumably, seek counsel, begin to prepare a defense, preserve important evidence, interview significant witnesses, and make an effort to memorialize exculpatory evidence. When one is unaware of the possibility of being accused, he has absolutely no motivation to take these precautionary measures. The government's comment that Crouch's failure to take precautionary measures is "of no moment" is naive. It may be of no moment to the government, but it is a fundamental reason for the very existence of the presumption. This Court agrees with the Magistrate Judge that the applicability of the doctrine of presumptive prejudice to the instant case cannot be ignored.

It is uncontroverted that Defendant Crouch actually failed to make preparations to defend himself against the present accusations because until 1992 he was assured he was *not* a target of any criminal investigation. Three different government officials left Crouch with the impression he was not the subject of a criminal investigation. Mr. Mimms, the FHLB examiner who made the referral only eight months after demanding Crouch's resignation in November, 1985, refused to tell Crouch he had done anything wrong. (pg. 107) In 1989, United States Attorney DeGabrielle, in discussions about Crouch's possible testimony against Gerjes, assured Crouch he was not the subject of a criminal investigation (pg. 64–5) and Agent Kettler, on several occasions, and at least once in the presence of Carolyn Hines (pg. 158–9), did so as well. (pg. 65) The government meets this testimony with the proposition that Crouch was not a target at the times he asked about his status because it was not until after Ferguson's debriefing that the government first learned of Crouch's involvement. This proposition is incredible. First, despite the government's contention to the contrary, there is nothing in the record to demonstrate that it was only after Ferguson implicated Crouch in January of 1992,

that he became a "technical" target; this "evidence" is contained in the government's objections and it is not before the Court. (See discussion at p. 3–4.) Furthermore, the March 10, 1986 criminal referral form (Defendants' Exhibit 1), Mimm's report of March 18, 1986 (Defendants' Exhibit 3), and Mimm's letter of July 31, 1986 (Defendants' Exhibit 2) contain references to the involvement of Crouch and Frye in the very transactions made the basis of this indictment, as well as other allegations of "potential violations of the loans-to-one-borrower-limitations, the probability of nominee borrowers, excessive attorney's fees due Mr. Crouch, deceptive loan practices, management actions which are increasing the risks of problem assets, and 'cooking the books' to show profits on the disposal of problem assets" (Defendants' Exhibit 3, pg. 2) Despite the availability of this information as early as March of 1986, the government allowed years to pass before focusing on these Defendants; years in which they could have been mustering a defense against this belated indictment. While this may not constitute bad faith to gain a tactical advantage [6], it certainly smacks of negligence sufficient, over an eight and one half year period of time, to constitute substantial presumptive prejudice to these Defendants. This Court will never be able to observe the defense Crouch and Frye could have mustered before the lapse of time since the criminal referral.

The Defendants have, despite the passage of time, also shown that the actual events which have occurred have resulted in some actual prejudice to supplement their reliance on the presumption; unfortunately, the passage of time frustrates the ability of this Court to accurately quantify the actual prejudice suffered. Without doubt, several otherwise potential defense witnesses are now actually dead and, despite the government's exhortation that none of them possessed relevant evidence not still obtainable from living

---

**6.** The Court is not making this finding now. Further inquiry might have revealed this to be the tip of the "bad faith" iceberg, but the Magistrate Judge granted the government's motion to quash the subpoenas for information in the investigative files of the United States Attorney and the Federal Bureau of Investigation where further evidence of bad faith might be located. In this Court's opinion, the record, in its present form, will not justify a finding of bad faith, but because of the limitations imposed by virtue of the rulings of the Magistrate Judge, it cannot be ruled out. This question may have to be addressed on another day.

persons, this Court can never know what the importance of their testimony would be. Crouch testified that his father, Mr. Gubert, and Mr. Tscherner could all testify about how Mr. Gerjes controlled matters at Delta Savings and how they relied on information from him and other inside officers. The government cries that none of this "irreplaceable" evidence would meet the testimony of Gerjes and Ferguson and as a result, in its opinion, there is no prejudice. This Court, however, is very troubled by the government's assertion. During cross-examination of Crouch, the government asked the following, revealing question: "Sir, if you were to hear the testimony of witnesses that you (Crouch) made all the major decisions at Delta Savings during 1985 and part of 1986 that you were there, would you be of the opinion that those people are lying when they said that?" (pg. 109) The obvious suggestion is that part of the government's case will include such testimony and, quite frankly, even though Crouch opined that such witnesses would simply be ill-informed, rather than lying, the testimony of the now-deceased and unaccused witnesses would be crucial to rebut the credibility of such testimony. This is especially so if such testimony comes from Gerjes [7] and/or Ferguson who are convicted cooperating witnesses eager to minimize their ultimate sentences through favorable prosecution testimony against the instant Defendants. Most important would be the lost testimony of Tscherner who, Crouch claims, could testify, *inter alia*, that "(t)he only people that were mentioned that Mr. Ferguson stated he dealt with at Delta Savings was Carl Gerjes and Andy Erskine." (pg. 61–2) Of course, the Defendants cannot state with specificity what these dead witnesses could actually have said, or how credible their testimony would have been, but they are **actually** irreplaceable and there is a distinct possibility that their testimony, which would obviously be relevant, would have been favorable to the Defendants.

In paragraph 13 of its objections, the government makes an interesting argument in mitigation of any prejudice suffered by the Defendants. The passage of time, it argues, does not diminish the vitality of the various documents involved in this case and it is within the four corners of the documents that the inference of wrongdoing lies. Would that it were so simple. Taking this "the documents speak for themselves" approach, the only burden of proof on the government to gain a bank fraud conviction would be the authentication of documents. This Court believes there is more to a criminal trial. Credibility of accusatory witnesses must be subject to meaningful impeachment; documents must be viewed in light of preparatory discussions, and the government must still prove criminal intent. Any evidence that would assist the Defendants in these areas is precisely the "exculpatory evidence" the government argues cannot exist in a "document driven" case. The argument is without merit. This is not an instance, as the government argues, where the Defendants cannot overcome the inferences of wrongdoing apparent on the face of documents; it is an instance where the delay causes the presumption to interact with the actual events to establish the threshold inquiry of prejudice.

There are actual events that have occurred that have prejudiced these Defendants, unfortunately, the passage of time frustrates the ability of this Court to quantify the actual prejudice suffered. There are also actual document problems. Several potentially important documents are missing. For example, the original "Waiver of Notice of Special Meeting of Directors of JMG Financial Corp." (pg. 82), which the government alleges to be an overt act of the conspiracy. The

---

7. Gerjes poses another problem. As Crouch testified, after the criminal referral from the FHLB, he specifically asked and received the assurance of Assistant United States Attorney DeGabrielle in 1989 that he was not targeted in the Delta investigation. (pg. 64–5) He sought this assurance before he agreed to testify against Gerjes fearing Gerjes would be motivated to retaliate in the event the government turned its attention toward him; history has now afforded Gerjes that opportunity. Although Crouch did not testify at Gerjes' trial, he did appear before Judge DeAnda willing to testify as the custodian of records for his law office. (pg. 87) The government's position that there is no connection with Gerjes' involvement in this case seems somewhat naive when considered in the realm of possible bias or motive of Gerjes' testimony against Crouch.

government claims the copy of this document in its possession is a forgery, however, Agent Kettler testified that without the original, no handwriting analysis can be done by the FBI laboratory. The unavailability of the original for expert analysis therefore deprives the defense of this significant opportunity to rebut the testimony of Mr. Dunn that the signature purporting to be his is a forgery. (pg. 272–3) Also missing is the original, as well as any copy, of the Profit Participation Agreement between JMG Corp. (Defendant Frye) and Ferguson C & D (government witness Robert Ferguson). Robert Johnson, the lawyer who prepared the agreement, together with a memorandum of the agreement for filing purposes could recall nothing about any conferences he might have had with Frye or Ferguson, but testified that from the memorandum it was obvious that the agreement was a "customized" agreement requiring client instructions. (pg. 129–31) This actual document, if available, might undercut the allegations of Frye as a nominee borrower. Other documents, although unidentified, are also gone. Frye purged his files at the time he relocated his office in September, 1990, four years after the criminal referrals. These files would have contained any workpapers concerning the transactions made the basis of this indictment. Ms. Gergen, Frye's employee, testified that Frye kept copious notes of every phone conversation he had (pg. 214), and, since the indictment had asked her about the possibility the files were still available (pg. 221). Crouch testified that he delivered personal records to the FBI (pg. 70–71) which pertained to these transactions and which, as a result, are no longer available to him. Even Tommy Sears, an FDIC section chief at the records management center, testified that the present whereabouts of original documents, including loan files and loan committee minutes, seized from Delta at its failure by the FSLIC is unknown (pg. 166). Despite the government's declaration that the Defendants have copies of all the government's trial exhibits, this Court can never know contents of the missing documents and their importance to the Defendants.

Having found prejudice, the Court must look to the government's efforts to rebut its effects; in the case at bar, those efforts fall short. The government's heretofore stated position that the Defendants should be satisfied with the documents the government intends to use against them at trial is untenable. The problem is with the documents that are missing or no longer exist; these are the documents that the Defendants urge could well have been preserved and aided them in their defense. The government's position that Crouch was disingenuous in his assertion of memory loss and that there is no evidence of Frye's dimming memory is unpersuasive. Fourteen pages of expert testimony established that everyone, including Frye, suffers memory loss over time. Moreover, the government's conclusion that Crouch was being selective and evasive in his recall is not obvious from the face of the record. Indeed, even as experienced and professional as is Agent Kettler, he too had difficulty remembering numerous salient details, due to the sheer passage of time. Finally, the government's assertion that the deceased witnesses had no relevant knowledge and no impeachment value, is defeated by the simple fact that this Court can never know.

The burden likewise fell upon the government to prove the lengthy pre-indictment delay was justifiable and reasonable, but its proof is unpersuasive. At the commencement of the hearing (pg. 45–49) after some colloquy with counsel, the Magistrate Judge made it clear that he might opt to apply the *Townley* "balancing test" to this case rather than the *Lovasco* "bad faith" approach. This clearly put the government on notice that any and all delay, not just tactical delay, might be relevant. The government was, therefore, cautioned, once again, to respect the seriousness of the Defendants' motion and to fully develop the record in support of its justification of the pre-indictment delay. Nonetheless, the government took a guarded approach, offering general excuses for delay which did not withstand cross-examination. Time and again, Agent Kettler, called by the government to explain the delay, was unable to recall important aspects of the investigation. He generally cited the J.R. McConnell fraud investigation, the Suzanne Renee Rich-

ardson kidnapping, the Dow Chemical espionage investigation, the Carl Gerjes prosecution and the First Great South West Bar–B–Que investigation, as significant investigations diverting his attention from the case at bar during the relevant period of time. On cross-examination, however, although he admitted receiving the criminal referral from the FHLB concerning Defendants Crouch and Frye in August of 1986 (pg. 253), he stated that "without looking into the files" (pg. 253) he couldn't testify to the date or approximate date he first worked on this case; the first time he talked to the FHLB referring agent; when he first started procuring documents; whether he received the FHLB interim examination of March 18, 1986 (pg. 257); what his first step was in this investigation (pg. 259); whether he was ever directed by the U.S. Attorney to speed up this investigation during the lengthy delay (pg. 260); or who received the Grand Jury subpoenas (pg. 261). Interestingly, the Magistrate Judge interrupted the testimony, voiced his concern about the agent's inability to respond to pointed questions by defense counsel, reminded the government that the *Townley* balancing test could be applicable, and asked the government if it would like a recess to permit the agent time to review his files in order to respond to the detailed and important information sought by the Defendants. The government declined this invitation preferring to avoid "specifics" (pg. 264) about the delay. These "specifics", or lack thereof, became highly and properly relevant to the Magistrate Judge when he thereafter chose to apply the *Townley* approach to this case.

 Even if this Court were inclined to accept the intervening investigations as justification for Agent Kettler's inability to give sufficient attention to this investigation during the eight year lapse of time, it would be of "no moment". This claim is nothing more than a complaint that there were insufficient personnel available to investigate or properly prepare this case; as such, it is insignificant. When the prejudice visited upon the Defendants by virtue of a lengthy pre-indictment delay is substantial, as this Court finds it to be in this case, lack of a sufficient number of processing personnel is, at best, entitled to only slight weight in the balance of due pro-

cess considerations. *Townley*, 665 F.2d at 586. The same would be said if the government were to claim prosecutorial overload. *Id.* at 586. This Court is not blind to the burdens placed on local FBI agents to investigate potential criminal activity in this district, nor is it unaware of the demands upon the United States Attorneys; indeed, this Court has great admiration for the job these entities perform given the budgetary constraints of the federal government, generally, and for Agent Kettler and counsel of record for the government in particular. This Court, however, can neither ignore the Due Process Clause of the Fifth Amendment, nor encourage the government to gamble with the interests of criminal suspects assigned a low prosecutorial priority, *Doggett*, —— U.S. at ——, 112 S.Ct. at 2693–94, 120 L.Ed.2d at 532, despite such realities or its admiration of the governmental personnel involved.

The government opines that the delay is built into bank fraud cases by the cunning of the perpetrators to conceal and convolute what they have done, (government objection paragraph 13); under certain circumstances, not present here, this argument might have merit. Unfortunately, the government had notice of the potential criminal activity of these Defendants in the very transactions made the basis of this indictment in early 1986 when the criminal referral was made and only four months after Crouch's removal as chairman of the board of Delta Savings. The subsequent eight year delay cannot be attributed to the ability and "cunning" of these Defendants to conceal any fraudulent nature of these transactions. The unjustifiable pre-indictment delay is no significant fault of the Defendants and its resultant prejudice, actual and presumptive, has not been rebutted by the government. These Defendants are entitled to relief.

It is, therefore, the **ORDER** of this Court that the motions of A. Guy Crouch, III, and Michael J. Frye to dismiss this indictment on the basis of undue prosecutorial delay is **GRANTED**; the indictment is **DISMISSED** with prejudice as to these Defendants.